In re **D.W.G.K. RESTAURANTS, INC.,** a **California corporation, dba Jimmy's Family Restaurant, et al., Debtor-in-Possession.**

**Bankruptcy No. 85–06182–H11.**

United States Bankruptcy Court, S.D. California.

March 25, 1988.

Colin W. Wied, William A. Smelko, Wied & Smelko, San Diego, Cal., for debtor.

Robert L. Purvin, Jr., Purvin & Hinton, San Diego, Cal., for Kostas Chelios and Susan Chelios.

## AMENDED MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

### I.

At issue is whether secured creditors Kostas Chelios and Susan Chelios ("the Chelios' ") are entitled to compensation for attorneys' fees and costs pursuant to § 506(b) or § 503(b)(3)(D) of the Bankruptcy Code. The Chelios' contend that (1) because the underlying unsecured agreement which lead to their receiving a judgment and ultimately a judgment lien against property of the debtor contained a provision providing for attorneys' fees, they are entitled to attorneys' fees to the extent they are secured pursuant to 11 U.S.C. § 506(b); and (2) that they are entitled to compensation for attorneys' fees and costs incurred pursuant to 11 U.S.C. § 503(b)(3)(D).

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157(b)(1) and General Order No. 312–D of the United States District Court, Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).

### FACTS

While the facts of this case are exceedingly complex, for the issues addressed herein a very simple recitation is necessary. The Chelios' received a judgment for breach of contract and constructive fraud against predecessors of the debtor, Mary Kaye, James Walters, James Daglas and Demetrius Gatsis (the "Jimmy's Family Group") on January 9, 1985, in the total amount of $108,169.96 including attorney fees and costs. Abstract of judgment No. 85–211994 was recorded against real property of the Jimmy's Family Group on June 14, 1985. On December 12, 1985, the debtor filed for protection under Chapter 11 of the Bankruptcy Code. On April 28, 1986, the debtor's Third and K Street property

was sold free and clear of liens pursuant to the order of this court, with the judgment lien attaching to the proceeds. On March 5, 1986, the Chelios' filed Claim No. 13 for $108,169.96. On March 12, 1987, Claim No. 13 was amended by Claim No. 87 for $170,000[1].

The Chelios' moved this court on September 3, 1987, for disbursal of the funds and for post judgment attorneys' fees and costs pursuant to §§ 503(b)(3)(D) and 506(b) of the Bankruptcy Code. At that time, the Chelios' requested $61,330.95 in fees, and $1,757.48 in costs. The entire $61,330.95[2] is attributed to work compensable under § 506(b), while $40,520, the total amount of attorneys' fees incurred by the Chelios' after the debtor filed its petition, is attributed to work compensable under § 503(b)(3)(D).

## II.

## DISCUSSION

### A. *The § 506(b) Claim.*

■ The Chelios' argue that they are entitled to reimbursement for all post judgment attorneys' fees and costs incurred by them, pursuant to § 506(b), to the extent that the sum of these fees and costs, combined with their claim, does not exceed the value of their security. The Chelios' concede that their security is a "judicial lien" as defined by 11 U.S.C. § 101(32). As such, the Chelios' claim for attorneys' fees must fail, because they are not and never have been the holder of a consensual security agreement secured by the debtor's property within the meaning of 11 U.S.C. § 101(44). A brief explanation of why § 506(b) claims are limited to consensual security interests is in order.

When two parties contract, they are free to deal with one another as they please. Therefore, when a security interest is granted, the party granting the security interest is fully cognizant of both the value of the underlying obligation and the value of the security interest which is placed "at risk" in the event that party fails to pay. On the other side of this transaction, the party receiving the security interest is free to demand security of sufficient value to cover any anticipated exposure caused by the other party's failure to perform on the underlying obligation. Section 506(b) merely respects the party's contractual rights by allowing the secured party the full extent of his bargained for security.

By contrast, the "shotgun marriage" between judgment debtor and judgment creditor lacks the contemporaneous *quid pro quo* element found in a consensual security interest. Rather, the judgment creditor is completely at liberty to record its abstract of judgment against any property owned by the judgment debtor. If § 506(b) allowed attorneys' fees to creditors with nonconsensual liens, a creditor who chose to record an abstract against a valuable and otherwise unencumbered asset of the debtor would be free to exhaust all the debtor's equity in that asset (at least to the extent actually necessary to protect that interest).

While it cannot be said that § 506(b) was intended to force judgment creditors into positions of partial security, should they elect to expend money pursuing a debtor who files for protection under the Bankruptcy Code, the proposition that a creditor who starts out with an unsecured obligation can somehow reduce the obligation to judgment and convert the obligation into one with all the protections of a contractual security interest is equally incongruous. Section 506(b) states that:

(b) To the extent that an allowed secured claim is secured by property, the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and reasonable fees, costs, or charges provided for under *the*

---

1. The court assumes that the basis for this claim amendment was the post petition attorneys' fees incurred by the Chelios'. No explanation was provided on the amended claim.

2. This figure has been arrived at by reference to debtor's points and authorities filed on August 14, 1987, and subsequent pleadings consistent therewith, although this court notes that the amount added to the prior claim to reach Claim No. 87 is $61,830.04.

*agreement* under which such claim arose. (Emphasis added).

The legislative history makes it perfectly clear that the agreement referred to in § 506(b) is a security agreement.

Section 506(b) of the House Amendment adopts language contained in the Senate Amendment and rejects the language contained in H.R. 8200 as passed by the House. If the *security agreement* between the parties provides for attorneys' fees, it will be enforceable under Title 11, not withstanding contrary law, and is recoverable from the collateral after recovery under § 506(c). (Emphasis added).

House of Representatives Debate, 124 *Cong.Rec.H.* 11095; App. 3 *Collier on Bankruptcy*, p. IX–98 (15th ed.1987).

Neither the original unsecured obligation nor the judgment lien fit within the scope of "security agreement" as used in the House of Representatives Debate and defined by the Code. 11 U.S.C. § 101(44). The original unsecured obligation was *an agreement* between the parties, but it did not create a security interest in some asset, as does a security agreement. (*See, e.g.*, UCC § 9–105(1); 11 U.S.C. §§ 101(44) and (45)). While it is true that the underlying claim did provide for attorneys' fees, which Chelios' were awarded in the state court action, this alone does not create security for repayment. The security arose when the Chelios' claim was reduced to judgment and a judgment lien recorded against the debtor's real property. However, the resulting judgment lien is not a *security agreement between the parties*, as discussed by the legislative history of § 506(b).

If this court were to allow a § 506(b) recovery on behalf of the Chelios', it would have to amalgamate these two discrete sets of rights into a single remedy which would provide greater rights than the Chelios' had either before or after judgment.

The Chelios' argument that state law applies to determine whether attorneys' fees are available has been rejected by this district, in favor of the position that federal law preempts state law on this question.

*In re Carey*, 8 B.R. 1000, 1004 (Bankr.S.D. Cal.1981) (§ 506(b) adopted with specific legislative intent of overriding any state law which would otherwise deny attorneys' fees to an oversecured creditor with a contractual right to reimbursement).

The Chelios' next assert that the doctrine of merger should not apply, and therefore the enforcement of the judgment lien should be subject to the attorneys' fees provision of the original unsecured agreement between the parties. In support of this claim, the Chelios' argue that *Matter of Salisbury*, 58 B.R. 635 (Bankr.D.Conn. 1985) stands for the proposition that attorneys' fees clauses survive state court judgments. This position creates an interesting three part dilemma. First, there is clearly authority in this circuit to the contrary. The bankruptcy court in *In re Schlecht*, 36 B.R. 236 (Bankr.D.Alaska 1983) had previously held that the doctrine of merger did apply and therefore the parties were limited to the terms of the judgment. Secondly, this court notes that in holding that the doctrine of merger did not bar attorneys' fees clauses, the *Salisbury* court was rectifying what it believed to be the anomalous result under the merger doctrine that a secured creditor would lose his right to attorneys' fees once a judgment was entered. Third, the underlying agreements in both *Schlecht* and *Salisbury* were security agreements—trust deeds—which is not true in the case at bar.

This court believes that an analysis of the merger doctrine is unnecessary to resolve the questions raised herein. Clearly, the holdings in *Schlecht* and *Salisbury* are inconsistent. However, to the extent that *Salisbury* is predicated on state law, it must be rejected in this district based on its direct conflict with the holding of *Carey*, which requires us to decide § 506(b) questions by relying exclusively on federal law. Second, while the *Salisbury* court was concerned with the anomaly of the merger doctrine stripping a secured creditor of his right to attorneys' fees, the case at bar is clearly inapposite. The Chelios' claim has been elevated from an unsecured to a secured claim as a result of the state court

judgment and subsequent judgment lien. Their rights have been substantially enhanced *vis-a-vis* this estate, since they will be paid substantially more than a similarly situated unsecured creditor with only an unrecorded judgment. Finally, this court notes that in both *Schlecht* and *Salisbury*, the original security agreement, standing alone, would have entitled oversecured creditors to attorneys' fees under § 506(b). By contrast, in the case at bar, standing alone, neither the judgment lien nor the unsecured agreement would have qualified the Chelios' for reimbursement of attorneys' fees pursuant to § 506(b). Rather, Chelios' claim amounts to an amalgamation of the two, which is clearly outside the scope of § 506. Therefore, the Chelios' are not entitled to attorneys' fees and costs under § 506(b).

B. *The § 503(b)(3)(D) Claim for Attorneys' Fees.*

The Chelios' also assert a right to reimbursement for all post petition attorneys' fees and costs pursuant to 11 U.S.C. § 503(b)(3)(D). Section 503 provides in pertinent part:

> (b) After notice and a hearing, there shall be allowed administrative expenses other than claims allowed under § 502(f) of this title, including—
>
> . . . .
>
> (3) The *actual, necessary* expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> . . . .
>
> (D) A creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under § 1102 of this title, *in making a substantial contribution* in a case under Chapter 9 or 11 of this title.... (Emphasis added).

The Chelios' assert that they made a substantial contribution through their involvement in seven definable areas: (1) Their general participation in the bankruptcy proceeding; (2) their efforts in attempting to form a creditors committee; (3) their filing of a complaint for non-dischargeability; (4) their filing of a motion for relief from stay; (5) their efforts in connection with the sale of the "3rd & K" property; (6) their efforts in connection with the sale of the "Sheryl Lane" property; and (7) their filing of a motion for disbursal of proceeds from the sale of the "3rd & K" property.

Professional persons are compensated pursuant to two provisions of the Bankruptcy Code. The first, § 330, is routinely used by professional persons providing services to the debtor, trustee or creditors committee. The prior approval of the court for all professional persons seeking compensation under this provision is required. Services rendered by a volunteer whose retention has not been approved by the court will not be allowed where application is made pursuant to § 330. The second provision authorizing compensation to professionals is § 503. Section 503 provides *inter alia* for an award of compensation as administrative expenses.

While there was no provision for compensation comparable to § 503 of the Code under Chapter XI of the Bankruptcy Act, comparable provisions did exist under Chapter X. Compensation provisions in Chapter X were created to encourage greater participation by individual creditors and committees. *In re Rockwood Computers, Inc.*, 61 B.R. 961, 964 (Bankr.S.D. Ohio 1986). *See*, 6A *Collier on Bankruptcy* para. 13.01 (14th ed.1977). Two provisions of Chapter X provided for compensation of professionals. Section 242 allowed the judge to award "reasonable compensation for services rendered." Section 243 limited compensation to services which contributed to a confirmed plan or refusal of a plan or which generally benefited the estate. *Rockwood*, 61 B.R. at 965.

As the case law developed, distinctions came to be made as to when compensation was allowable by the court under §§ 242 and 243. Thus, no allowance would be made where the service for which compensation was sought was ren-

dered "primarily in the sole interests of the particular individual or group represented." ... [Citation omitted] nor was claimant "entitled to an allowance for activity where the activity amounts to the performance of some function or duty of the trustee, debtor-in-possession, or officer of the estate." ... [Citation omitted]. It was said that then the claimant is a mere volunteer. [6A *Collier on Bankruptcy*, § 13.06(b) (14th ed. 1977).

*Rockwood,* 61 B.R. at 965.

■ Section 503 limits the allowance of administrative claims to services which make a "substantial contribution...." The words "substantial contribution" are derived from Chapter X. *In re Calument Realty Co.,* 34 B.R. 922, 925 (Bankr.E.D. Pa.1983); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 566 (Bankr.C.D.Utah 1985). Substantial contribution has been defined as

Services ... which foster and enhance, rather than retard or interrupt the progress of reorganization ... Those services which are provided solely for the client-as-creditor, such as those services rendered in prosecuting a creditor's claim, are not compensable. [Compensable services] are those which facilitated the progress of these cases.... *In re Richton International Corp.,* 15 B.R. 854, 857 (Bankr.S.D.N.Y.1981). Put another way, services must provide a "demonstrable benefit to the debtor's estate, [or] the creditors, ... in order to be compensable. *In re Jensen–Farley Pictures, Inc.,* 47 B.R. at 569.

*In re Paolino,* 71 B.R. 576 (Bankr.E.D.Pa. 1987).

An incidental benefit is not a sufficient basis to grant an administrative priority. *Matter of Patch Graphics,* 58 B.R. 743, 746 (Bankr.W.D.Wis.1986).

■ In addition to the requirement that the creditor show that the services rendered a significant and demonstrable benefit, an administrative expense may not be allowed absent a finding that the expense is necessary for preserving the estate. *In re Club Development & Management*

*Corp.,* 27 B.R. 610, 612 (9th Cir.BAP 1982). Since an administrative expense constitutes a priority claim, any recovery must be subject to strict scrutiny by the court. Priority statutes are strictly construed. *Standard Oil Company v. Kurtz,* 330 F.2d 178, 180 (8th Cir.1964). The burden of proof is on the party making the administrative claim. *Patch Graphics,* 58 B.R. at 745. *See, Woods v. City National Bank and Trust Company,* 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). The term "actual" and "necessary" must be narrowly construed to preserve the estate. *Patch Graphics,* 58 B.R. at 745.

The movant bears a heavy burden in requesting compensation under § 503(b).

While "substantial contribution" does not require a contribution that leads to confirmation of a plan the phrase clearly requires contribution which provides tangible benefits to the bankruptcy estate and the other unsecured creditors. Thus to the extent that the "substantial contribution" requirement adds anything to the requirements discussed previously, it is to increase the burden of proof which a claimant for administrative expense must bear.

*Patch Graphics,* 58 B.R. at 746.

Turning to the bases for the Chelios' claim, the services rendered by counsel for the Chelios' were primarily for the benefit of the Chelios'. Furthermore, the services satisfied neither the "substantial contribution" nor the "actual and necessary" requirements of § 503(b).

■ The first area for which the Chelios' request compensation is for their general participation in the case. This area includes attendance at hearings, review of proceedings, review of debtor's counsel's billings, participation in plan confirmation and proceedings, participation in the debate regarding the reasonable value of the various assets sold and negotiations among the creditors. While there can be no doubt that such participation does make a contribution, these actions are both self-interested and duplicative. The Chelios' have alleged no tangible benefits from their general participation. Furthermore, there were

numerous other participants in these proceedings, all of which made similar contributions. Extensive participation, alone, is not sufficient to compel compensation under § 503(b). *In re Ace Finance Co.*, 69 B.R. 827 (Bankr.N.D.Ohio 1987).

The next area in which the Chelios' allege that they are entitled to compensation is their role in attempting to form a creditors committee. In *In re W.G.S.C. Enterprises, Inc.*, 47 B.R. 53, 58 (Bankr.N.D.Ga. 1985) Judge William Norton held that the efforts of a creditor in attempting to form a creditors committee were not compensable. In *W.G.S.C.*, as in the case at bar, no creditors committee was formed. Furthermore, the Chelios' have alleged no tangible benefit to either the creditors, the debtor or the estate from their efforts. Therefore, compensation is not appropriate.

The third action for which the Chelios' request compensation was their efforts in connection with the filing of a motion for relief from stay. However, relief from stay is a classically adversarial action in which debtor and creditor have antagonistic interests. Again, the Chelios', allege no tangible benefit. Clearly, this is a self-interested action by the Chelios', for which compensation is not available.

The fourth area in which the Chelios' claim to have benefited the estate is the filing of a complaint for non-dischargeability. Once again, this is an antagonistic action, in which the Chelios' were acting in their own self-interest. No tangible benefit is alleged. As such, no compensation can be awarded.

The fifth area in which the Chelios' claim that they benefited the estate is their involvement in the sale of the 3rd & K property. The sale of assets, however, clearly falls within the duties of the debtor-in-possession and any professional hired by the debtor-in-possession. To the extent any benefit resulted from the Chelios' involvement (none is alleged) it is duplicative and therefore non-compensable.

The sixth area in which the Chelios' claim a benefit was rendered involves their role in the sale of the Sheryl Lane property. The Chelios' point to their finding a potential buyer and this potential buyer's contacting the ultimate buyer as being a substantial benefit. However, as with the 3rd & K property, the duty to sell the property falls on the debtor-in-possession and professional persons it chooses to hire. Absent a showing that the debtor-in-possession was unwilling or unable to perform its duties, the Chelios' must be considered volunteers.

Finally, the Chelios' seek compensation for filing a motion to compel distribution of the proceeds of the sale of the 3rd & K property. The primary beneficiary of the distribution was the Chelios. As such, there can be no doubt that this was a self-interested and non-compensable act.

Compensation cannot be freely given to all creditors who take an active role in bankruptcy proceedings. Compensation must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate. *See, In re Richton International Corp.*, 15 B.R. at 854. Such an involvement takes the form of constructive contributions in key reorganizational aspects, when but for the role of the creditor, the movement towards final reorganization would have been substantially diminished. The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to significant and tangible benefits to the creditors, debtor, or the estate. While § 503 was enacted to encourage meaningful creditor participation, it should not become a vehicle for reimbursing every creditor who elects to hire an attorney.

## CONCLUSION

Neither the unsecured agreement between the Chelios' and the predecessors of the debtor, which contained an attorneys' fee clause, nor the judgment lien, entitles the Chelios' to attorneys' fees to the extent they are oversecured pursuant to § 506(b). Furthermore, a judgment lien and an unsecured agreement cannot be amalgamated to create an agreement which would entitle the Chelios' to compensation under § 506(b). Finally, the Chelios' contribution to these proceedings were primarily for

their own benefit and substantially duplicative and therefore not compensable under § 503(b)(3)(D).

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Bankr.R. 7052. Counsel for the debtor is directed to file with this court an Order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.